**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JOHN N. PALMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3304 |
| | ) | |
| NANCY BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff John N. Palmer appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Palmer filed a Motion for Summary Judgment (d/e 13).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 16).  The parties consented to proceed before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered January 19, 2018 (d/e 7)</u>. For the reasons set forth below, the Decision of the Commissioner is affirmed.

<u>STATEMENT OF FACTS</u>

Palmer was born on September 8, 1971. He completed high school. He previously worked as an arcade attendant; forklift operator; and a sorter, pricer, E-bay sale. Palmer suffered from coronary artery disease, diabetic peripheral neuropathy, hypertension, and obesity. Palmer filed his application for Disability Benefits on March 26, 2014. He alleged that he became disabled on August 9, 2013, the day after he suffered a myocardial infarction (heart attack). R. 12, 25, 27, 34-35, 291.[1]

In July 2012, Palmer's former employer laid off Palmer from his work as a forklift operator. R. 52. On July 11, 2012, Palmer saw neurologist Dr. Rana Mahmood, M.D., for numbness and tingling in his lower extremities especially in the bottoms of his feet and the medial aspects of both feet. R. 411-12. Dr. Mahmood noted that a specialist five years before diagnosed tarsal tunnel syndrome, but Palmer did not have any surgery at that time. In the intervening five years, Palmer was diagnosed with diabetes. Palmer's primary care physician Dr. Alan Bilyeu, M.D., referred Palmer to Dr. Mahmood for further recommendations. R. 411.

---

[1] Dr. Vittal Chapa, M.D., noted that Palmer had an 11th grade education. R. 338. Palmer testified that he had a high school education. R. 52.

Palmer told Dr. Mahmood that his feet hurt and had more tingling and numbness with prolonged standing. Palmer reported that his symptoms were more below the knees. Palmer reported fatigue, but no loss of consciousness, fainting, or convulsions. Palmer said he had aching and cramping in his lower extremities. Palmer was taking Ultram (tramadol) for the pain. R. 411. Dr. Mahmood assessed tarsal tunnel syndrome entrapment neuropathy versus diabetic induced distal symmetric sensory motor polyneuropathy. He ordered electrodiagnostic studies. R. 412. The record does not show that the studies occurred.

On May 13, 2013, Palmer saw Dr. Alan Bilyeu. Palmer reported "terrible problems with his neuropathy." Palmer said that he could not tell where his feet were and could not tell whether something was hot or cold. He reported difficulty walking. He said he was looking for work, but no one would hire him because of his neuropathy. On examination, Palmer was 74 inches tall and weighed 255 pounds. He had a body mass index (BMI) of 32.5. Palmer's A1c was 8.5.[2] Dr. Alan Bilyeu diagnosed diabetic neuropathies and increased the dosage of Neurontin (gabapentin). Dr.

---

[2] The "A1c" score represents the amount of glucose attached to the hemoglobin in the blood. The A1c provides information about the average level of blood glucose. A normal A1c is below 5.7 percent. An A1c of 6.5 percent or more is considered diabetic. National Institute of Diabetes and Digestive and Kidney Diseases, "The A1c Test & Diabetes", located at https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test, visited on October 4, 2018.

Alan Bilyeu noted, "Gave him the phone number to the department of rehabilitation services in Decatur.  He needs to do something or go on disability because he is getting worse.  He may continue to get worse because of his poorly controlled DM (diabetes mellitus)."  R. 349.

On August 8, 2013, Palmer had a heart attack.  He was taken to St. John's Hospital in Springfield, Illinois.  Dr. Robert Pacheco, M.D., performed a procedure in which he put two drug eluting stents in Palmer's heart.  Palmer was discharged from the hospital on August 9, 2013.  R. 291-92.

On September 17, 2013, Palmer saw cardiologist Dr. Mark Steen, M.D. for a follow up after his heart attack and the placement of stents in his heart.  R. 318-21.  Palmer denied any chest pain or angina.  Palmer reported joint pain and stiffness, and numbness and tingling in the extremities.  R. 320.  Palmer's neurological examination was normal.  R. 320.  Dr. Steen recommended an echocardiogram in three months.  R. 319.

On February 11, 2014, Palmer saw Dr. Thomas Bilyeu, M.D., for a blood sugar check.[3]  Palmer said that he had terrible pain in his feet and

---

[3] Drs. Alan Bilyeu, Alison Bilyeu, and Thomas Bilyeu worked together and all treated Palmer at various points in time.

could hardly walk.  Palmer said he was not able to find work.  He said that the Neurontin did not help with the neuropathy, but the tramadol "helped some."  On examination, Palmer's A1c was 11.1.  Dr. Thomas Bilyeu discontinued the Neurontin and prescribed Glipizide and Nortriptyline.  Dr. Thomas Bilyeu noted, "I suggested he might want to look into Social Security disability.  He probably will have a very hard time getting employment."  R. 347.  On March 6, 2014, Dr. Thomas Bilyeu doubled Palmer's tramadol dosage.  R. 347.

On June 20, 2014, Palmer completed a Function Report – Adult form. R. 207-14.  Palmer said that his condition limited his ability to work because,

> Cant (sic) drive far, cant (sic) stand long, cant (sic) climb, can't feel things with hands, no grip, blood sugar spikes, cant (sic) get overheated, short of breaths, cant (sic) walk for long times, have hard time lifting The pain bothers with my consitration (sic) on tasks have to stop a lot because of nerve pains.

R. 207.  Palmer said he and his wife took care of his 14-year-old daughter. Palmer dressed himself and took care of his personal hygiene.  He said that while bathing, he could not feel his feet while standing and he could not tell between cold and hot water.  R. 208.  Palmer said he prepared sandwiches and frozen meals on a daily basis.  He said he could no longer stand long enough to prepare larger meals.  Palmer also said he daily did

laundry, made beds, washed small loads of dishes, and swept. He said each of these tasks took 15 minutes a day. R. 209. Palmer said he went outside six times a day. He walked, drove, and rode to travel. He regularly shopped for food and household products. Each shopping trip took 15 to 30 minutes. R. 210. Palmer said he walked three times a day for 15 to 30 minutes depending on his pain. R. 211.

Palmer said he went fishing three times a year and went hunting eight times a year. He said he did not hunt alone anymore. He also said he could not walk far while fishing and hunting. He said his friend took him hunting and fishing. He said he talked to his children while fishing. R. 211.

Palmer opined that he could lift 20 pounds and walk for 15 to 30 minutes before he had to stop and rest. He said he could not squat, and he lost his balance bending over. He said his feet hurt while standing and walking. He said he could not feel his feet while standing or climbing stairs. He said his legs went numb when he sat. He said that completing tasks took extra time because he had no feeling in his hands. R. 212.

Palmer said he could follow written and oral instructions and he got along with authority figures. He said he did not handle stress well and he did not like changes in his routine very often. He said he was afraid of having another heart attack. R. 213.

On August 12, 2014, Palmer saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  R. 338-42.  Palmer reported that he had diabetes and a heart problem.  He said he had two stents in his heart.  He said he had neuropathy with numbness in his feet and toes.  He said he could not feel pain in his toes and could not feel the gas pedal when he drove.  Palmer said that he also had stabbing pain in his fingers and the fourth and fifth fingers on both hands were numb.  Palmer also reported occasional stabbing pain in his chest.  R. 338.

On examination, Palmer was 73 inches tall and weighed 253 pounds. Palmer had decreased pinprick sensation on the fourth and fifth finger of the non-dominant left hand, loss of pinprick sensation in his feet and lower legs, loss of position sense in the right foot, and decreased vibration sense in the right foot.  Palmer had 5/5 strength in both hands and could perform both fine and gross manipulations with both hands.  Dr. Chapa diagnosed diabetes, hypertension, peripheral neuropathy, hypothyroidism, and coronary artery disease.  R. 340.

On August 14, 2014, Palmer saw Dr. Alan Bilyeu to get a referral to a new cardiologist.  His old cardiologist Dr. Steen moved.  Palmer reported that he was having neuropathy symptoms in his hands as well as his feet. Dr. Alan Bilyeu noted that Palmer's last A1c "was terrible at 11.1."  R. 360.

On August 20, 2014, state agency physician Dr. Richard Lee Smith, M.D., prepared a Physical Residual Functional Capacity Assessment of Palmer. R. 79-81. Dr. Smith opined that Palmer could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, and scaffolds; and should avoid even moderate exposure to hazards such as machinery or heights. R. 80-81. Dr. Smith noted decreased sensation, but no motor weakness or muscle atrophy, good grip strength and movement of fingers, and full range of motion of his joints. R. 80.

On December 23, 2014, state agency physician Dr. Bernard Stevens, M.D., prepared a Physical Residual Functional Capacity Assessment of Palmer. R. 90-92. Dr. Stevens opined that Palmer could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; never climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to extreme heat and cold. Dr. Stevens opined that Palmer had no other functional restrictions due to his medical impairments. R. 90-91.

On June 16, 2015, Palmer had an echocardiogram of his heart and a stress test.  R. 386-93.  The test showed a moderate to severe fixed defect in the anterioapical wall of his heart; no evidence of transient ischemic dilation, and an ejection fraction of 45%.  The stress test was negative, and Palmer had no complaints of chest pain.  R. 392.

On July 3, 2015, Palmer saw Dr. Alan Bilyeu for an open ulcer on his right foot.  Palmer was referred to Decatur Memorial Hospital's Wound Clinic in Decatur, Illinois.  R. 383.  The record does not include evidence from the Wound Clinic.

On July 16, 2015, Palmer had an ultrasound of his right foot.  The test showed a normal right lower extremity arterial evaluation.  R. 384.

On August 10, 2015, Dr. Alan Bilyeu's nurse indicated that Palmer was getting therapeutic shoes.  She noted that he had a previous history of a foot ulcer.  R. 383.

On November 2, 2015, Palmer saw Dr. Alan Bilyeu's nurse who noted that Palmer had missed an appointment with the Wound Clinic.  The nurse noted that the foot ulcer originally measured .6 cm in length and .9 to 1.1 cm in depth on August 6, 2015.  As of September 24, 2015, the ulcer had shrunk to .3 cm in length and .1 cm in depth.  R. 383.

On March 31, 2016, Palmer saw Dr. Alison Bilyeu, M.D.  Palmer said he felt fatigued.  He said his blood sugars were running in the 300s and 400s.  On examination, Palmer could move all his extremities without paresthesia.  His blood sugar reading was 402, and his A1c was too high to read, which meant in excess of 15.  Dr. Alison Bilyeu adjusted his medication and scheduled him to return for regular checks to see if his diabetes could be brought under control.  R. 381.

On June 2, 2016, Palmer saw Dr. Alison Bilyeu.  Palmer reported blood sugars readings of 200 to 300 at times and shortness of breath at times.  Palmer said he had more weakness in his ankles in the past year.  Palmer said he had not been able to feel his feet for years.  On examination, Palmer had no sensation above the ankles bilaterally, but movement was still intact.  His A1c was 13.2.  Dr. Alison Bilyeu said that the A1c reading was "improved from his last visit when it was too high to register."  Palmer weighed 266 pounds and had a BMI of 34.62.  R. 377, 397.

On July 11, 2016, Palmer saw Dr. Alison Bilyeu.  Palmer reported that his blood sugar readings were still in the 200s.  Palmer reported that he fell twice in the past week.  He said he was "just walking when he fell."  Palmer said that walking was difficult because of his neuropathy.  Palmer

said that he was falling more because his balance was "off." Palmer said he could not feel his feet come out of his shoes sometimes. On examination, sensation was diminished throughout Palmer's lower extremities, unchanged from the previous exam. Palmer's gait was slightly wide-based. Palmer's A1c was 12. Dr. Alison Bilyeu adjusted Palmer's medication and referred him for physical therapy. Dr. Alison Bilyeu noted that Palmer was scheduled to see a specialist in October 2016. R. 375, 396.

Dr. Alison Bilyeu also wrote a letter on July 11, 2016 regarding Palmer's condition. Dr. Alison Bilyeu stated in the body of the letter:

> My patient Mr. John Palmer (9/8/71) has been diabetic and under our care since at least 2003. He has severe peripheral neuropathy likely secondary to his diabetes. His diabetes is still poorly controlled at this time, and we are adjusting his medications in order to improve his control. Because of his peripheral neuropathy, walking and work would be difficult at this time. He has had frequent falls because of this. If you have any questions please will free to contact me.

R. 400.

On October 5, 2016, Palmer saw neurologist Dr. Claude Fortin, M.D., for a neurological consultation on his peripheral neuropathy. Palmer reported that his blood sugar readings were in the high 100s and low 200s. Palmer reported numbness and pain in his feet since 2003. Palmer said he

tried Lyrica, but it made him dizzy and irritable.  Palmer said the gabapentin did not help with the pain.

Dr. Fortin's examination findings are confusing.  Dr. Fortin stated that Palmer:  (1) had normal muscle tone and bulk with 5/5 strength throughout all of his extremities; (2) symmetrical reflexes; (3) intact pin, touch, and vibration sensation; and (4) intact toe, heel and tandem gait.  R. 417.  Dr. Fortin also stated that Palmer:  (1) had 5/5 strength in his upper extremities and 4/5 strength in his lower extremities; (2) could not toe stand or heel stand "due to apparent weakness," but did not have foot drop; (3) intact toe, heel, and tandem gait; (4) diffuse areflexia in his reflexes; and (5) reduced pin sensation in a glove and stocking distribution.[4]  R. 418.  Dr. Fortin diagnosed long-standing diabetes and diabetic polyneuropathy.  Dr. Fortin planned to conduct a metabolic polyneuropathy workup, he prescribed a trial of carbamazepine, and he suggested trying generic Cymbalta.  R. 418-19.

---

[4] Dr. Fortin's notes contained a typographical error in which the term "heel stand" was typed "she'll stand." R. 418.

# THE ADMINISTRATIVE HEARING

The Administrative Law Judge (ALJ) conducted a hearing on November 30, 2016.  R. 47-65.[5]  Palmer appeared with his attorney.  A vocational expert Mary K. Andrews also appeared.  Palmer testified first.  He was six feet two inches tall and weighed 260 pounds.  He lived with his wife and 16 year-old daughter.  His wife drove him to the hearing.  He said he drove once a week to the gas station a block from his home.  He did not drive out of town.  He had a high school education.  R. 52.

Palmer said he could dress himself and take care of his personal hygiene, but his wife sometimes helped him in and out of the shower, depending on how he felt.  His wife worked nights and slept at home all day.  His daughter went to school during the day.  Palmer said that during the day he did, "[p]retty much, nothing, except, now and then start a load of laundry or sweep the floor."  R. 54.  He did not do any other housework.  He walked around the block several times a day because of his heart.  R. 55.  Otherwise, he said he watched television and napped during the day.  R. 56.

---

[5] The ALJ held a prior hearing on June 30, 2016.  R. 66-75.  Palmer's original attorney withdrew shortly before this hearing.  Palmer stated he wanted to find another lawyer.  The ALJ continued the matter to allow Palmer to do so.  R. 69-70.

Palmer last worked in 2012 as a forklift operator. He was laid off in July 2012. He said his condition worsened in 2013. His feet started to go numb. He said he could not feel his feet anymore. Palmer stated he could not work sitting because his legs go numb and tingle when he sits. He said he needed to get up and move around. R. 52-53.

The ALJ asked Palmer if he could do a job where he could go back and forth between sitting and standing. Palmer said he did not know. R. 56. On questioning by his attorney, Palmer explained that he could not work eight hours a day even with an option to sit or stand because he was too fatigued. He said he was fatigued because he did not sleep well at night. He also indicated he had problems staying on task because of the fatigue. R. 56-57.

Palmer testified he did not sleep well because of his pain. Palmer said he was in pain constantly. Pain medication helped, but did not eliminate his pain. He also could not walk very much because he fell regularly. He said he fell once every two months. R. 57. His diabetes was "pretty controlled," but he still had pain and numbness. R. 59.

Palmer testified he last went fishing in August 2016. A friend drove him to the fishing site and he sat and fished for two hours. He was "pretty

drained" after two hours of sitting and fishing.  He said he used to go fishing all day long, not just two hours.  R. 58.

Vocational expert Andrews then testified.  The ALJ asked the following hypothetical question:

> Assume the past work's the same as the Claimant's; exertional capacity, limited to light work; no climbing of ladders, ropes, or scaffolds; other postural functions performed occasionally; but also, would need to be able to alternate between a standing position and a seated position, let's say, well, not necessarily at will, but as circumstances would allow, so that, by the end of the day, one could sit or stand equally, in the aggregate, alternating every 30 minutes, if desired.
>
> As I already said, no climbing of ladders, ropes, or scaffolds; and the postural functions, occasional; manipulative functions, frequent.  They need to avoid hazards; need to avoid concentrated exposure to pulmonary irritants and to humidity; and owing to chronic pain, a limitation to the performance of simple, repetitive tasks that would involve little or no change in work routine.
>
> That would preclude the past work?

R. 59-60.  The ALJ clarified that all of the person's manipulative functions would be limited to frequent.  Andrews opined that such a person could not perform Palmer's prior work. R. 60.

Andrews gave his opinion that a person with Palmer's age, education and work experience could perform jobs that exist in the national economy, including: router with 2,604 such jobs in Illinois and 53,624 nationally; routing clerk, with 1,934 such jobs in Illinois and 41,336

nationally; and parking attendant with 704 such jobs in Illinois and 25,503 nationally. R. 61. Andrews stated that all these jobs were light exertional jobs.

The ALJ asked Andrews to assume that the person was limited to sedentary work. Andrews opined that such a person could perform jobs that existed in the national economy, including: addresser with 87 such jobs in Illinois and 6,131 nationally; and surveillance system monitor, with 202 such jobs in Illinois and 5,681 nationally. Andrews reduced the number of addresser jobs that actually existed by 80 percent to account for the sit/stand option. She reduced the number of surveillance monitor jobs that actually existed by 10 percent to reflect the sit/stand option. R. 61-62.

Andrews opined that a person could not be absent more than once a month and maintain employment. Andrews opined that the person would need to stay on task at work 85 to 90 percent of the time to work the types jobs she identified in her answers. R. 62-63.

At the end of the hearing, the ALJ asked Palmer if he wanted to say anything else. Palmer said,

> I think the only thing I would have a problem with, that I it's just the amount of work that I can do at a  time and actually, getting to work, because – I mean, driving's not the best thing for me to do, because I can't feel the gas pedals and other things. What I- - I can't feel what I step on and stuff.

I mean, it's -- I can step on a toy or whatever, and I'm going to fall, because I don't feel what I step on, you know. I can't tell the difference. If I step off a ledge, on a step or - - that's why I have my wife drive me.

I don't know if any of these would allow transportation to get to work.

R. 64.  The hearing concluded.

## THE DECISION OF THE ALJ

On January 13, 2017, the ALJ issued his decision.  R. 25-36.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Palmer met his burden at Steps 1 and 2. The ALJ found that Palmer had not worked since the date he allegedly became disabled July 9, 2013, and he had the severe impairments of coronary artery disease, diabetic peripheral neuropathy, hypertension and obesity. R. 27. At Step 3, the ALJ determined that Palmer's impairments or combination of impairments did not meet or equal a Listing. R. 27-29.

At Step 4, the ALJ found that Palmer had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except must be able to alternate between a standing and seated position periodically equally during the day if desired at 30 minute intervals; no climbing of ladders, ropes, and stairs; other postural activities occasionally; manipulative functions frequently; must avoid hazards; must avoid concentrated exposure to extreme temperatures, humidity, and pulmonary irritants; and owing to chronic physical pain and fatigue, a limitation to the performance of simple and repetitive tasks involving little or no change in work routine.

R. 29. The ALJ noted that Palmer stopped working because he was laid off, not because of any functional limitations caused by his impairments. The ALJ further found the medical evidence conflicted with Palmer's descriptions of his functional limitations. The ALJ relied on the lack of treatment, particularly the lack of treatment by specialists. The ALJ also relied on Dr. Chapa's consultative examination; the opinions of Drs. Smith and Stevens; the second portion of Dr. Fortin's October 2016 examination notes that indicated intact toe, heel, and tandem gait, 5/5 upper extremity strength, and 4/5 lower extremity strength; Palmer continued on the same pain medication, tramadol, and the dosages of tramadol were changed infrequently; and Palmer's activity level was greater than would be expected based on his descriptions of his symptoms. The ALJ found that this evidence was consistent with the RFC of an ability to perform a limited

amount of light work.  The ALJ found that Palmer's statements to the contrary were not persuasive in light of the other evidence.

The ALJ found that Dr. Thomas Bilyeu's February 2014 statement that Palmer would have a hard time finding employment and Dr. Alison Bilyeu's statements in her July 2016 letter were inconsistent with the other evidence and not entitled to controlling weight.[6]  The ALJ found that Drs. Bilyeu's statements were not functional analyses and may have only referred to Palmer's ability to engage in his prior relevant work, not any work in the national economy.  R. 34.

The ALJ found at Step 4 that Palmer could not perform his prior work. The ALJ relied on Palmer's RFC and vocational expert Andrew's opinions. R. 34-35.  At Step 5, the ALJ found that Palmer could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P, Appendix 2, and Andrew's opinions that Palmer could perform the representative jobs of router, routing clerk, parking lot attendant, call out operator and addresser. R. 35.  The ALJ concluded that Palmer was not disabled.

---

[6] The ALJ mistakenly referred to Dr. Thomas Bilyeu and Dr. Alison Bilyeu as the same person, Dr. A. Bilyeu.

Palmer appealed.  On October 20, 2017, the Appeals Council denied

Palmer's request for review.  The decision of the ALJ then became the final

decision of the Defendant Commissioner.  R. 1.  Palmer then filed this

action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least

minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's opinion is supported by substantial evidence.  The RFC finding is supported by Dr. Chapa's examination that found good grip strength and the ability to do fine and gross manipulations, the opinions of Drs. Smith and Stevens, and the finding by Dr. Fortin that Palmer had 4/5 strength in his lower extremities and an intact heel, toe, and tandem gait. The RFC was also supported by the June 2015 cardiac evaluation that had a negative stress test and no report of pain.  The RFC was also supported by the ALJ's analysis of the evidence of Palmer's activities.

Palmer raises several issues on appeal.  The Court addresses them in order.  Palmer first argues that the ALJ erred in that he failed to explain the basis for his RFC determination.  The Court disagrees.  The ALJ discussed the evidence in detail in a narrative form and explained as he went through the evidence his analysis and its relation to the RFC determination.  See R. 31 (discussing impact of the following evidence on Palmer's RFC:  his lay-off from work; his daily activities; and his functional limitations from heart attack and coronary artery disease); R. 32-33

(discussing the diabetic neuropathy evidence and explaining its impact on the RFC determination); R. 33-34 (discussing the opinion evidence and explaining the impact on the RFC determination). The ALJ adequately explained the basis for the RFC.

Palmer argues that the ALJ did not ground his RFC finding in the medical evidence. The Court disagrees. The ALJ gave some weight to the opinions of Drs. Smith and Stevens. Those opinions supported a finding that Palmer had at least the functional capacity described in the RFC finding. The ALJ relied on Dr. Fortin's findings that Palmer had an intact gait and 4/5 strength in his lower extremities. The ALJ relied on Dr. Chapa's findings that Palmer had 5/5 hand grip strength and could perform gross and fine manipulations. The ALJ's RFC determination was grounded in the evidence. The ALJ adjusted the RFC based on Palmer's testimony that his pain caused fatigue and limited his ability to concentrate by limiting him to simple, repetitive tasks. The ALJ further adjusted the RFC based on Palmer's testimony that he needed to change from a sitting to a standing position periodically. The ALJ grounded the RFC determination in the evidence. Palmer's arguments to the contrary are not persuasive.

Palmer argues next that the ALJ erred because he did not contact Palmer's Drs. Bilyeu to flesh out their opinions. The Court disagrees. An

ALJ should contact a treating physician to provide clarification if the physician opined on an issue reserved for the Commissioner and the basis for the opinion is not clear.  SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).  The basis for the opinions of Drs. Bilyeu were clear.  They opined that he could not work because of his diabetic neuropathy.  The ALJ did not need to seek clarification.

Palmer argues that the ALJ did not resolve the inconsistencies in Dr. Fortin's opinion.  Palmer asserts the ALJ should have noted the inconsistencies in Dr. Fortin's treatment note and should have explained how he resolved those inconsistencies.  See 20 C.F.R. § 404.415.1520b. Any error was harmless because the ALJ cited to and relied on the more limiting finding that Palmer had 4/5 strength in the lower extremities, and in the consistent finding throughout the treatment note that Palmer had intact heel, toe, and tandem gait.  The Court sees no reversible error.

Palmer asserts that the ALJ committed error when the ALJ did not include in a hypothetical question the "frequent falls" of Palmer.  Palmer argues that the ALJ's statement that "frequent falls" are not a functional limitation which needs to be included as a part of Plaintiff's residual functional capacity is incorrect.  To reach this conclusion Palmer claims that the falls should have been included because they were related to his

peripheral neuropathy.  The ALJ discussed the Plaintiff's peripheral neuropathy and considered it in formulating his conclusions regarding Plaintiff's reasonable residual functional capacity.  R. 33-34.  Hence, the ALJ considered Palmer's falling when formulating his residual functional capacity and failure to include Palmer's falling in a hypothetical to the vocational expert is not error.

Palmer argues that the ALJ erred in limiting Palmer to simple tasks to address his fatigue and loss of concentration due to his pain.   Palmer argues that his position is supported by <u>Varga v. Colvin</u>, 794 F.3d 809, 815 (7th Cir. 2015).  The only issue facing the court in <u>Varga</u> was whether the hypothetical question posed to the vocational expert accounted for mental limitations in areas of "concentration, persistence and pace" as noted by the doctor who was the state agency psychological consultant in <u>Varga</u>.  <u>Id</u>. at 813.  There is no mental limitation noted by the medical sources in this case.  The ALJ cannot formulate such limitations on his own.  Palmer does not have a severe mental impairment.  R. 27.  The ALJ so found and Palmer did not challenge this finding.  The mental impairment cases, such as <u>Varga</u> and the cases cited therein, do not apply in this case.  Rather, Palmer repeatedly stated that his pain interfered with his sleep.  As a result, he was fatigued and had a hard time concentrating and finishing tasks.

The ALJ adjusted the RFC to address this evidence by limiting Palmer to simple, routine, repetitive tasks.  Such tasks would be easier to complete than other types of work and would not require significant concentration.  Palmer's testimony supports the ALJ's analysis.  There was no error on this point.

Lastly, Palmer argues that the ALJ erred in his analysis of Palmer's daily activities.  Palmer essentially asks the Court to reweigh the evidence.  The Court will not do so.  See Alvarado v. Colvin, 836 F.3d 744, 747 (7th Cir. 2016); Jens, 347 F.3d at 212. The Court finds no error in the ALJ's analysis of Palmer's activities.

THEREFORE, IT IS ORDERED that the Defendant Commissioner's Motion for Summary Affirmance (d/e 16), is ALLOWED, Plaintiff John Palmer's Motion for Summary Judgment (d/e 13) is DENIED, and the decision of the Commissioner is AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS CLOSED.

ENTER:   December 10, 2018

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE